IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
AIKEN DIVISION

| | | |
|---|---|---|
| Caroline Broxson, | ) | C/A No.: 1:14-105-JMC-SVH |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | REPORT AND RECOMMENDATION |
| Commissioner of Social Security | ) | |
| Administration, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

This appeal from a denial of social security benefits is before the court for a
Report and Recommendation ("Report") pursuant to Local Civ. Rule 73.02(B)(2)(a)
(D.S.C.). Plaintiff brought this action pursuant to 42 U.S.C. § 405(g) and § 1383(c)(3) to
obtain judicial review of the final decision of the Commissioner of Social Security
("Commissioner") denying her claim for Disability Insurance Benefits ("DIB") and
Supplemental Security Income ("SSI"). The two issues before the court are whether the
Commissioner's findings of fact are supported by substantial evidence and whether she
applied the proper legal standards. For the reasons that follow, the undersigned
recommends that the Commissioner's decision be affirmed.

I.      Relevant Background

    A.      Procedural History

On May 25, 2011, Plaintiff filed applications for DIB and SSI in which she alleged
her disability began on October 1, 2010. Tr. at 186–92, 193–98. Her applications were
denied initially and upon reconsideration. Tr. at 130–31, 140, 142. On July 25, 2012,

Plaintiff had a hearing before Administrative Law Judge ("ALJ") Ronald Sweeda. Tr. at 33–64 (Hr'g Tr.). The ALJ issued an unfavorable decision on August 28, 2012, finding that Plaintiff was not disabled within the meaning of the Act. Tr. at 11–32. Subsequently, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner for purposes of judicial review. Tr. at 1–4. Thereafter, Plaintiff brought this action seeking judicial review of the Commissioner's decision in a complaint filed on January 13, 2014. [ECF No. 1].

> B.    Plaintiff's Background and Medical History

> 1.    Background

Plaintiff was 37 years old at the time of the hearing. Tr. at 38. She completed the tenth grade. Tr. at 39. Her past relevant work ("PRW") was as a cashier, a certified nursing assistant ("CNA"), and a pharmacy tech. Tr. at 58. She alleges she has been unable to work since October 1, 2010. Tr. at 186.

> 2.    Medical History

Plaintiff presented to Colleton Medical Center on June 29, 2010, after attempting suicide by drug overdose. Tr. at 304. Laboratory tests were positive for cannabinoids and benzodiazepines. Tr. at 306. She was hospitalized June 30–July 7, in the Lowcountry Transitions Crisis Stabilization Unit, where her medications were adjusted. Tr. at 326–27. Plaintiff complained of anxiety, panic, difficulty falling and staying asleep, irritability, agitation, poor appetite, and psychomotor agitation. Tr. at 329–30. Plaintiff's discharge

diagnosis was bipolar disorder, type I. Tr. at 327. Her global assessment of functioning ("GAF") score[1] was 40 upon admission and 53 upon discharge. *Id.*

Plaintiff was admitted to an outpatient program at Charleston Center on July 26, 2010, for treatment of alcohol and cannabis dependence. Tr. at 284–85. Her GAF score was 35 upon admission. Tr. at 284. She reported a history of bipolar disorder and indicated that she had attempted suicide on two occasions. Tr. at 285. Plaintiff was discharged from Charleston Center on August 23, 2010, after having completed services. Tr. at 286.

On August 31, 2010, Plaintiff presented to Elizabeth Leonard, M.D., for a medication check. Tr. at 372. She reported being clean and sober for 30 days. *Id.* She denied problems and indicated her sleep, appetite, energy, mood, and concentration were good. *Id.* She denied anxiety, depression, panic attacks, psychosis, and suicidal/homicidal ideations. *Id.* Dr. Leonard noted that Plaintiff would be transferring treatment to Colleton

---

[1] The GAF scale is used to track clinical progress of individuals with respect to psychological, social, and occupational functioning. American Psychiatric Association: *Diagnostic & Statistical Manual of Mental Disorders,* Fourth Edition, Text Revision. Washington, DC, American Psychiatric Association, 2000. The GAF scale provides 10-point ranges of assessment based on symptom severity and level of functioning. *Id.* If an individual's symptom severity and level of functioning are discordant, the GAF score reflects the worse of the two. *Id.* However, the Fifth Edition of the *Diagnostic & Statistical Manual of Mental Disorders* ("*DSM-V*") does not include the GAF scale for several reasons, including "its conceptual lack of clarity (i.e., including symptoms, suicide risk, and disabilities in its descriptors) and questionable psychometrics in routine practice." American Psychiatric Association: *Diagnostic & Statistical Manual of Mental Disorders*, Fifth Edition. Arlington, VA, American Psychiatric Association, 2013. The *DSM-V* instead uses the World Health Organization's Disability Assessment Schedule ("WHODAS") to provide a global measure of disability.

Mental Health Center and that she was giving Plaintiff a three-month supply of all medications. Tr. at 373.

On October 8, 2010, Plaintiff presented to the emergency department at Colleton Medical Center complaining of abdominal pain accompanied by nausea, loss of appetite, and vomiting. Tr. at 294. She had moderate tenderness in her upper abdomen. Tr. at 297. She was diagnosed with cholelithiasis and cholecystitis and hospitalized from October 8–13 after undergoing open cholecystectomy. Tr. at 324.

On December 2, 2010, Plaintiff presented to Kellie C. Bishop, M.D., for an initial psychiatric assessment. Tr. at 374–76. Plaintiff endorsed symptoms of depression and sleep disturbance, but indicated her energy was variable, her concentration was okay, and her appetite was good. *Id.* Dr. Bishop prescribed Depakote ER and instructed Plaintiff to take her medications at night to help with sleep. Tr. at 376.

Plaintiff followed up with Dr. Bishop on February 3, 2011. Tr. at 377–78. She reported that she discontinued use of Tofranil because it was making her fidgety and causing nightmares. Tr. at 377. She reported continued sobriety. *Id.* Plaintiff indicated that her mood was good and that she had not been too angry or irritable. *Id.* She reported good sleep, appetite, and concentration, but indicated her energy level was low. *Id.*

On April 7, 2011, Plaintiff followed up with Dr. Bishop. Tr. at 379–80. She reported increased appetite and weight gain. Tr. at 379. She stated she was worried about her mother and that she felt anxious during the day. *Id.* However, she also reported good sleep, energy, and focus, and indicated that she was performing some cleaning jobs from

4

time-to-time. *Id.* Dr. Bishop prescribed a few extra Klonopin for Plaintiff's anxiety and discontinued her prescription for Atarax because Plaintiff was not taking it. Tr. at 380.

Plaintiff visited the Franklin C. Fetter Family Health Center regarding back pain on May 12, 2011. Tr. at 447. She complained of back and shoulder pain. *Id.* A prescription for Xanax was refilled. *Id.*

On June 16, 2011, Dr. Bishop completed a statement in which she indicated Plaintiff was diagnosed with major depressive disorder, recurrent and severe, without psychotic features. Tr. at 389. She wrote Plaintiff had been prescribed Depakote ER, Klonopin, Remeron, and Atarax and that medication had helped Plaintiff's condition. *Id.* Dr. Bishop noted Plaintiff was oriented to all spheres; had an intact thought process; presented appropriate thought content; displayed normal mood/affect; demonstrated good attention/concentration; and showed good memory. *Id.* She indicated Plaintiff exhibited "slight" work-related limitation in function due to her mental condition and further wrote "[w]hen she has an exacerbation of her depression[,] her ability to work is obviously limited." *Id.*

Plaintiff followed up with Dr. Bishop on June 30, 2011. Tr. at 391–92. She reported continued sobriety, but indicated that it was difficult for her to be around others who were using marijuana. Tr. at 392. Dr. Bishop noted Plaintiff's weight and appetite were up and down. *Id.* Plaintiff reported anxiety and mind racing, but indicated her sleep was mostly good and her energy level was okay. *Id.* Dr. Bishop noted Plaintiff continued to work in cleaning jobs. *Id.*

On July 2, 2011, Plaintiff attended a consultative examination with Charles Rittenberg, M.D. Tr. at 393–94. Dr. Rittenberg observed that Plaintiff had no difficulty getting on and off the exam table, bent 60 degrees at her waist, demonstrated exaggerated kyphosis of her thoracic spine, and had decreased range of motion in her shoulders. Tr. at 394. All other exam findings were normal. *Id.* Dr. Rittenberg noted that Plaintiff's "chronic upper back pain" was "likely related to her kyphosis." Tr. at 394.

On July 13, 2011, state agency consultant Lisa Varner, Ph.D., completed a psychiatric review technique in which she indicated that Plaintiff met the "A" criteria of the Listings for affective disorders, anxiety-related disorders, and substance addiction disorders. Tr. at 70. She found that Plaintiff did not meet the "B" criteria under the Listings because Plaintiff had mild restriction of activities of daily living; moderate difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence, or pace, and one or two episodes of decompensation. *Id.* She indicated that the evidence did not establish the presence of the "C" criteria under any of the Listings. *Id.* Dr. Varner noted that Plaintiff was moderately limited with respect to the ability to understand and remember detailed instructions; the ability to carry out detailed instructions; the ability to maintain attention and concentration for extended periods; the ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; and the ability to interact appropriately with the general public. Tr. at 74–75. Dr. Varner provided that Plaintiff's symptoms and impairments "would not preclude the performance of simple, repetitive work task in a setting that does not require on-going interaction with the public." Tr. at 75.

6

Plaintiff followed up at the Franklin C. Fetter Family Health Center on July 14, 2011. Tr. at 446. Kyphosis was indicated, but the notes from this visit were generally illegible. *Id.*

Plaintiff presented to Charles J. Nivens, M.D., for initial evaluation of low back and left knee pain on August 18, 2011. Tr. at 421–24. She complained of back stiffness, weakness in her bilateral legs, and positional pain. Tr. at 421. She complained of aching left knee pain affecting her abilities to sleep, ambulate, and sit for prolonged periods. *Id.* Dr. Nivens's examination of Plaintiff's lumbar spine revealed decreased flexion with pain, decreased extension with pain, decreased right-sided bending with pain, decreased left rotation with pain, and decreased right rotation with pain. Tr. at 422. A neurotension test was positive in Plaintiff's left lower extremity. Tr. at 423. Her gait was antalgic, but her motor strength was normal. *Id.* Dr. Nivens noted a scoliotic curve in Plaintiff's lumbar spine, mid-thoracic spine at T5 to T9, and lower thoracic spine at T10 to T12. *Id.* Plaintiff demonstrated no atrophy. *Id.* Plaintiff's coordination and deep tendon reflexes were good, but bilateral Babinski reflexes, bilateral Hoffman signs, and bilateral ankle clonus were absent. *Id.* Light sensory examination was normal except for decreased sensation in the L3, L4, L5 and S1 dermatomes on the left. *Id.* An x-ray of Plaintiff's cervical spine indicated levoscoliosis, increased forward flexion of Plaintiff's head over the shoulder girdle, and increased kyphosis in the thoracic spine. *Id.* However, the x-ray report suggested "[m]ild scoliosis may be accentuated by patient position/muscle spasm" and "[v]ery mild diffuse chronic and degenerative changes." Tr. at 426. An x-ray of

7

Plaintiff's lumbar spine revealed levoscoliosis with rotation, but was otherwise unremarkable. Tr. at 423, 425.

On September 6, 2011, state agency consultant Mary Lang, M.D., completed a physical residual functional capacity assessment in which she indicated Plaintiff was limited as follows: occasionally lift and/or carry 50 pounds; frequently lift and/or carry 25 pounds; stand and/or walk (with normal breaks) for a total of about six hours in an eight-hour workday; sit (with normal breaks) for a total of about six hours in an eight-hour workday; push and/or pull limited to frequent in the bilateral upper extremities; frequently climb ladders, ropes, and scaffolds; frequently stoop; frequently crawl; and frequently lift overhead with the bilateral upper extremities. Tr. at 72–73.

On September 8, 2011, Plaintiff followed up at the Franklin C. Fetter Family Health Center for a recheck of kyphosis and scoliosis. Tr. at 445. The treatment notes indicated no abnormalities. *Id.* Treatment notes reflect prescriptions for Xanax 0.5 mg, three times daily; Lortab 7.5 mg; and Soma 7.5 mg. *Id.*

Plaintiff followed up with Dr. Bishop on September 19, 2011. Tr. at 430–32. She reported that she was moving from her sister's home to her mother's home after her brother-in-law accused her of stealing a family member's pain medication. Tr. at 430. Plaintiff denied substance abuse, but her sister indicated Plaintiff was being dishonest. *Id.* Plaintiff reported doing well with good sleep and energy. *Id.* Dr. Bishop expressed concern with Dr. Nivens's decision to prescribe narcotic pain medications in light of Plaintiff's history of substance abuse. Tr. at 431.

On December 14, 2011, David R. Beckert, M.D., indicated on DSS Form 1247 that Plaintiff had diagnoses of major depressive disorder and panic disorder; that her disability was permanent; and that she was unable to work or participate in activities to prepare for work. Tr. at 456–57.

Plaintiff followed up with Dr. Nivens on January 16, 2012, complaining of low back and leg pain. Tr. at 439. Dr. Nivens refilled Plaintiff's prescription for Soma and instructed her to follow up in one week. *Id.*

On January 17, 2012, state agency consultant Kimberly Brown, Ph.D., completed a psychiatric review technique in which she indicated Plaintiff met the "A" criteria for Listings 12.04 for affective disorders, 12.06 for anxiety-related disorders, and 12.09 for substance addiction disorders. Tr. at 100. She found that Plaintiff's impairments did not meet the "B" criteria under the Listings because she had mild restriction of activities of daily living; moderate difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence, or pace; and one or two episodes of decompensation. Tr. at 101. Dr. Brown determined that Plaintiff's impairments did not meet the "C" criteria for any of the Listings. *Id.* She found that Plaintiff was moderately limited with respect to the following: the ability to understand and remember detailed instructions; the ability to carry out detailed instructions; the ability to maintain attention and concentration for extended periods; the ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; and the ability to interact appropriately with the general public. Tr. at 105–06. Dr. Brown noted that Plaintiff's racing thoughts "could interfere with understanding, remembering,

9

and carrying out detailed instructions" and that she "may on occasion miss a day of work due to exacerbations of psychiatric symptoms." Tr. at 105. Dr. Brown also found that Plaintiff's impairments and symptoms "would not preclude the performance of simple, repetitive work tasks in a setting that does not require on-going interaction with the public." Tr. at 106.

On February 1, 2012, Plaintiff presented to Ajay V. Sood, M.D., for psychiatric treatment. Tr. at 443–44. She reported doing "fair" with "okay" sleep, but had increased anxiety and racing thoughts. Tr. at 443. Dr. Sood prescribed Depakote ER 500 mg, two pills to be taken at bedtime; Klonopin 1 mg to be taken twice daily; and Remeron 30 mg to be taken at bedtime. Tr. at 444.

On February 15, 2012, Tom Brown, M.D., completed a physical residual functional capacity assessment in which he indicated Plaintiff had the following limitations: occasionally lift and/or carry 50 pounds; frequently lift and/or carry 25 pounds; stand and/or walk (with normal breaks) for a total of about six hours in an eight-hour workday; sit (with normal breaks) for a total of about six hours in an eight-hour workday; push and/or pull limited to frequent in bilateral upper extremities; frequently climbing ladders, ropes, and scaffolds; frequently stooping; frequently crawling; and frequently lifting overhead. Tr. at 103–04.

On May 16, 2012, Plaintiff presented to Franklin C. Fetter Family Health Center after being discharged from the hospital following an asthma attack. Tr. at 458. She was prescribed Singulair, Ventolin HFA, and Albuterol. *Id.*

On July 23, 2012, Jeannette Coaxum completed a mental residual functional capacity questionnaire in which she indicated she treated Plaintiff for one hour per month for mood disorder and panic disorder. Tr. at 451. She indicated that Plaintiff had the following signs and symptoms: blunt, flat, or inappropriate affect; feelings of guilt or worthlessness; mood disturbance; bipolar syndrome with a history of episodic periods manifested by the full symptomatic picture of both manic and depressive syndromes (and currently characterized by either or both syndromes); emotional lability; and easy distractibility. Tr. at 452. Ms. Coaxum indicated that Plaintiff had limited, but satisfactory ability to complete all tasks necessary to perform unskilled work. She indicated that Plaintiff was seriously limited, but not precluded from performing all tasks necessary to perform semi-skilled and skilled work and to do particular types of jobs. Tr. at 453. She noted that Plaintiff's impairments or treatment would likely cause her to be absent from work more than four days per month. Tr. at 455. This form was subsequently signed by Denise Cornish-McTighe, M.D., but she did not date it or provide any additional information. Tr. at 465.

C.     The Administrative Proceedings

1.     The Administrative Hearing

a.     Plaintiff's Testimony

At the hearing on July 25, 2012, Plaintiff testified that she was five feet, nine inches tall and weighed approximately 185 pounds. Tr. at 38. She stated she had a driver's license, but was only able to drive when someone else was in the car with her. Tr. at 39.

Plaintiff testified that she last worked as a third shift manager in a store. *Id.* She indicated that she stopped working because of pain in her back, neck and knees that affected her concentration and ability to perform stocking responsibilities. *Id.* She testified that she tried to clean houses, but was unable to do the job for more than a month at a time. Tr. at 52.

Plaintiff testified constant pain prevented her from working. Tr. at 41. She stated she took Lortab and Soma for pain. *Id.* Plaintiff testified she experienced panic attacks that varied in frequency. Tr. at 48. She indicated she had asthma and chronic bronchitis, which were exacerbated by the kyphosis in her thoracic spine. Tr. at 50. She testified that she attempted suicide in 2007, after her father and sister died, and that she had been hospitalized twice for mental health problems. Tr. at 53. She stated she was diagnosed with bipolar disorder. Tr. at 55.

Plaintiff testified that she saw Dr. Nivens every two months, Ms. Coaxom once a month, and a psychiatrist once or twice a month. Tr. at 41, 43. Plaintiff denied side effects from medications. Tr. at 43.

Plaintiff testified that she could sit and stand for 15 to 20 minutes at a time. *Id.* She testified that she could not walk to her sister's house, which was approximately five minutes away, without stopping to rest. Tr. at 44. Plaintiff indicated that no doctor had restricted her lifting. *Id.* She stated that she had no problems using her hands. *Id.* Plaintiff indicated that she experienced shaking when having a panic attack or an asthma attack. *Id.*

Plaintiff testified that she last drank alcohol on August 23, 2010. Tr. at 45. She stated that she lived in a mobile home with her mother and three children, ages seven, eight, and eighteen. Tr. at 49.

Plaintiff testified that she would lie down for approximately 45 minutes to an hour off-and-on throughout a typical day. Tr. at 52. She also indicated that she spent a couple of days per week in bed. Tr. at 54.

b.    Vocational Expert Testimony

Vocational Expert ("VE") Arthur F. Schmitt reviewed the record and testified at the hearing. Tr. at 57–60. The VE categorized Plaintiff's PRW as a cashier as light and unskilled; as a CNA as medium and semi-skilled; and as a pharmacy tech as light and semi-skilled. Tr. at 58. The ALJ described a hypothetical individual of Plaintiff's vocational profile who could perform medium work that would not involve exposure to temperature extremes, high humidity, unprotected heights, or dangerous machinery; would be limited to performing simple, repetitive tasks, not involving direct customer service; and should avoid a fast-paced production environment. *Id.* The VE testified that the hypothetical individual could perform unskilled jobs at the medium exertional level as an egg packer, *Dictionary of Occupational Titles* ("*DOT*") number 920.687-134, with 1,982 jobs in South Carolina and 360,000 nationally; a hand packager, *DOT* number 920.587-018, with 9,800 jobs in South Carolina and 706,000 nationally; and a laundry operator, *DOT* number 361.684-014, with 3,100 jobs in South Carolina and 211,000 nationally. *Id.* The ALJ next asked the VE to assume the same restrictions, but to further assume that the individual was limited to light work. Tr. at 59. The VE identified

13

unskilled jobs at the light exertional level as a coupon redemption clerk, *DOT* number 290.477-010, with 270 jobs in South Carolina and 15,900 jobs nationally; a lacer, *DOT* number 690.685-254, with 110 jobs in South Carolina and 19,000 nationally; and a parking-lot attendant, *DOT* number 915.473-010, with 610 jobs in South Carolina and 129,000 jobs nationally. *Id.* Finally, the ALJ asked the VE to assume that the hypothetical worker would miss at least three days of work per month. *Id.* The VE testified that the hypothetical worker would be able to perform no jobs in the national economy. *Id.*

Plaintiff's attorney asked the VE to assume that the hypothetical individual would have to take two unscheduled breaks of 15 to 20 minutes each during the work day. Tr. at 60. The VE testified that the individual would be unable to perform any jobs in the national economy. *Id.* Plaintiff's attorney asked the VE to assume that the individual would be unable to maintain concentration necessary to perform even simple work for up to one-third of a workday. *Id.* The VE testified that there would be no jobs in the national economy that the hypothetical individual could perform. *Id.*

2.    The ALJ's Findings

In his decision dated August 28, 2012, the ALJ made the following findings of fact and conclusions of law:

1.    The claimant meets the insured status requirements of the Social Security Act through September 30, 2012.
2.    The claimant has not engaged in substantial gainful activity since October 1, 2010, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).
3.    The claimant has the following severe impairments: scoliosis, asthma, history of substance abuse disorder, depression and anxiety (20 CFR 404.1520(c) and 416.920(c)).

14

4.    The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5.    After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b). Specifically, the claimant can lift, carry, push and/or pull 20 pounds occasionally and 10 pounds frequently. She can sit for 6 hours in an 8-hour day, and stand and walk for 6 hours in an 8-hour day, with normal breaks. However, she cannot have exposure to temperature extremes, high humidity, unprotected heights or dangerous machinery. The claimant is limited to performing simple, repetitive tasks that do not involve direct customer service. Additionally, she cannot work in a fast-paced production environment.

6.    The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7.    The claimant was born on September 5, 1974 and was 36 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8.    The claimant has a limited education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9.    Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.   Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant number in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

11.   The claimant has not been under a disability, as defined in the Social Security Act, from October 1, 2010, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

Tr. at 16–26.

II.    Discussion

Plaintiff alleges the Commissioner erred for the following reasons:

1)    the ALJ neglected to consider the combined effects of all of her impairments;

2)      the ALJ failed to accord proper weight to the findings and opinions of her treating physician;

3)      the ALJ did not give proper weight the opinion Dr. Beckert provided to the South Carolina Department of Social Services ("SCDSS") indicating that she was disabled; and

4)      the ALJ's determination that Plaintiff could perform other jobs was not supported by substantial evidence.

The Commissioner counters that substantial evidence supports the ALJ's findings and that the ALJ committed no legal error in his decision.

A.      Legal Framework

1.      The Commissioner's Determination-of-Disability Process

The Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability." 42 U.S.C. § 423(a). Section 423(d)(1)(A) defines disability as:

> the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

42 U.S.C. § 423(d)(1)(A).

To facilitate a uniform and efficient processing of disability claims, regulations promulgated under the Act have reduced the statutory definition of disability to a series of five sequential questions. *See, e.g., Heckler v. Campbell*, 461 U.S. 458, 460 (1983) (discussing considerations and noting "need for efficiency" in considering disability

claims). An examiner must consider the following: (1) whether the claimant is engaged in substantial gainful activity; (2) whether she has a severe impairment; (3) whether that impairment meets or equals an impairment included in the Listings;[2] (4) whether such impairment prevents claimant from performing PRW;[3] and (5) whether the impairment prevents her from doing substantial gainful employment. *See* 20 C.F.R. §§ 404.1520, 416.920. These considerations are sometimes referred to as the "five steps" of the Commissioner's disability analysis. If a decision regarding disability may be made at any step, no further inquiry is necessary. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4) (providing that if Commissioner can find claimant disabled or not disabled at a step, Commissioner makes determination and does not go on to the next step).

A claimant is not disabled within the meaning of the Act if she can return to PRW as it is customarily performed in the economy or as the claimant actually performed the work. *See* 20 C.F.R. Subpart P, §§ 404.1520(a), (b), 416.920(a), (b); Social Security

---

[2] The Commissioner's regulations include an extensive list of impairments ("the Listings" or "Listed impairments") the Agency considers disabling without the need to assess whether there are any jobs a claimant could do. The Agency considers the Listed impairments, found at 20 C.F.R. part 404, subpart P, Appendix 1, severe enough to prevent all gainful activity. 20 C.F.R. § 404.1525. If the medical evidence shows a claimant meets or equals all criteria of any of the Listed impairments for at least one year, she will be found disabled without further assessment. 20 C.F.R. § 404.1520(a)(4)(iii). To meet or equal one of these Listings, the claimant must establish that her impairments match several specific criteria or be "at least equal in severity and duration to [those] criteria." 20 C.F.R. § 404.1526; *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990); *see Bowen v. Yuckert*, 482 U.S. 137, 146 (1987) (noting the burden is on claimant to establish his impairment is disabling at Step 3).

[3] In the event the examiner does not find a claimant disabled at the third step and does not have sufficient information about the claimant's past relevant work to make a finding at the fourth step, he may proceed to the fifth step of the sequential evaluation process pursuant to 20 C.F.R. § 404.1520(h).

Ruling ("SSR") 82-62 (1982). The claimant bears the burden of establishing her inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5).

Once an individual has made a prima facie showing of disability by establishing the inability to return to PRW, the burden shifts to the Commissioner to come forward with evidence that claimant can perform alternative work and that such work exists in the regional economy. To satisfy that burden, the Commissioner may obtain testimony from a VE demonstrating the existence of jobs available in the national economy that claimant can perform despite the existence of impairments that prevent the return to PRW. *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002). If the Commissioner satisfies that burden, the claimant must then establish that she is unable to perform other work. *Hall v. Harris*, 658 F.2d 260, 264–65 (4th Cir. 1981); *see generally Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987) (regarding burdens of proof).

### 2.    The Court's Standard of Review

The Act permits a claimant to obtain judicial review of "any final decision of the Commissioner [] made after a hearing to which he was a party." 42 U.S.C. § 405(g). The scope of that federal court review is narrowly-tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the Commissioner applied the proper legal standard in evaluating the claimant's case. *See Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Walls*, 296 F.3d at 290 (*citing Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)).

The court's function is not to "try these cases de novo or resolve mere conflicts in the evidence." *Vitek v. Finch*, 438 F.2d 1157, 1157–58 (4th Cir. 1971); *see Pyles v.*

*Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (*citing Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). Rather, the court must uphold the Commissioner's decision if it is supported by substantial evidence. "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 390, 401; *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005). Thus, the court must carefully scrutinize the entire record to assure there is a sound foundation for the Commissioner's findings and that her conclusion is rational. *See Vitek*, 438 F.2d at 1157–58; *see also Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed "even should the court disagree with such decision." *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

      B.     Analysis

           1.     Combined Effects of Plaintiff's Impairments

      Plaintiff argues that the ALJ failed to consider all of her impairments and their combined effects on her ability to engage in substantial gainful activity. [ECF No. 12 at 5]. Plaintiff maintains that the ALJ neglected to consider the effects of thoracic kyphosis and gastroesophageal reflux disease ("GERD") on her ability to work. *Id.* at 5–6.

      The Commissioner argues that there was no basis for the ALJ to find that kyphosis and GERD were severe impairments. [ECF No. 13 at 10].

      A severe impairment is one that "significantly limits [a claimant's] physical or mental ability to do basic work activities." 20 C.F.R. §§ 404.1520(c), 416.920(c). A non-severe impairment is defined as one that "does not significantly limit [a claimant's]

physical or mental ability to do basic work activities." 20 C.F.R. §§ 404.1521(a), 416.921(a).

A finding of a single severe impairment at step two of the sequential evaluation process is enough to ensure that the factfinder will progress to step three. *See Carpenter v. Astrue*, 537 F.3d 1264, 1266 (10th Cir. 2008) ("[A]ny error here became harmless when the ALJ reached the proper conclusion that [claimant] could not be denied benefits conclusively at step two and proceeded to the next step of the evaluation sequence."). Therefore, this court has found no reversible error where the ALJ does not find an impairment severe at step two provided that he considers that impairment in subsequent steps. *See Washington v. Astrue*, 698 F. Supp. 2d 562, 580 (D.S.C. 2010) (collecting cases); *Singleton v. Astrue*, No. 9:08-1982-CMC, 2009 WL 1942191, at *3 (D.S.C. July 2, 2009).

When a claimant has multiple impairments, the statutory and regulatory scheme for making disability determinations, as interpreted by the Fourth Circuit, requires that the ALJ consider the combined effect of these impairments in determining the claimant's disability status. *See Walker v. Bowen*, 889 F.2d 47, 50 (4th Cir. 1989); *see also Saxon v. Astrue*, 662 F. Supp. 2d 471, 479 (D.S.C. 2009) (collecting cases in which courts in this District have reiterated the importance of the ALJ's explaining how he evaluated the combined effects of a claimant's impairments). The Commissioner is required to "consider the combined effect of all of the individual's impairments without regard to whether any such impairment, if considered separately, would be of such severity." 42 U.S.C. § 423(d)(2)(B) (2004). The ALJ must "consider the combined effect of a

claimant's impairments and not fragmentize them." *Walker*, 889 F.2d at 50. "As a corollary, the ALJ must adequately explain his or her evaluation of the combined effects of the impairments." *Id.*

However, the Fourth Circuit later indicated that "the adequacy requirement of *Walker* is met if it is clear from the decision as a whole that the Commissioner considered the combined effect of a claimant's impairments." *Brown v. Astrue*, C/A No. 0:10-CV-1584-RBH, 2012 WL 3716791 (D.S.C. Aug. 28, 2012) citing *Green v. Chater*, 64 F.3d 657, 1995 WL 478032, at *3 (4th Cir. 1995).

The ALJ found that Plaintiff's severe impairments included scoliosis, asthma, history of substance abuse disorder, depression, and anxiety. Tr. at 16. He specified that GERD, acute cholecystitis/gangrenous cholecystitis, and knee pain were non-severe impairments. Tr. at 17. Although he did not explicitly address whether kyphosis was a severe or non-severe impairment, he addressed the impairment in the decision, indicating that Dr. Rittenberg noted chronic upper back pain secondary to exaggerated kyphosis of the thoracic spine, but that Dr. Rittenburg did not indicate any resulting limitations and that x-rays showed nothing more than mild scoliosis and mild degenerative changes. Tr. at 20.

The ALJ wrote that he had "considered the combined effects of the claimant's alleged impairments, both severe and non-severe, on the claimant's ability to work," and that "[w]hile the combination of the claimant's alleged back, neck, and knee pain may affect her ability to lift and carry, there is no indication in the record that the claimant's ability to sustain consistent function has been complicated by the combination of these

impairments." Tr. at 18–19. He further indicated "[a]lthough her physical impairments may contribute to her affective and anxiety-related disorders, there is no evidence that the combination of the claimant's impairments imposes greater limitations than those inherent in the residual functional capacity" he assessed. Tr. at 19. He wrote that he "considered the claimant's reports of neck and back pain in limiting the amount she can lift and carry" and that he considered potential side effects of her pain medications in "finding she cannot work at unprotected heights or around dangerous machinery." Tr. at 20–21. He indicated that he considered Plaintiff's asthma "in limiting her to light work with no exposure to temperature extremes or high humidity." Tr. at 21. He found that Plaintiff's psychiatric symptoms were relatively stable with prescribed medication and routine counseling and that she "retains the ability to perform simple, repetitive tasks." Tr. at 22. [I]n light of her anxiety and alleged panic attacks, he found that "she cannot perform any direct customer service work or work in a fast-paced production environment. *Id.* The ALJ noted that he "considered the claimant's history of drug and alcohol abuse and her potential for relapse in finding she cannot work at unprotected heights or around dangerous machinery." Tr. at 23.

The undersigned recommends a finding that the ALJ adequately considered the combined effects of Plaintiff's impairments. The ALJ provided a comprehensive and well-reasoned explanation for his conclusions regarding Plaintiff's impairments and their limiting effects and considered Plaintiff's impairments in combination. *See* Tr. at 18–23. The ALJ set forth adequate reasons for determining that GERD was not a severe impairment, citing Plaintiff's lack of significant treatment for the impairment. Tr. at 16.

Furthermore, neither the medical records nor Plaintiff's testimony suggest that GERD exacerbated or was exacerbated by any of Plaintiff's other impairments, which supports the ALJ's conclusion that GERD did not significantly limit Plaintiff's ability to do basic work activities. Although the ALJ neglected to explicitly cite kyphosis as a severe impairment at step two of the evaluation process, he considered kyphosis at subsequent steps in limiting Plaintiff to lifting and carrying 20 pounds occasionally and 10 pounds frequently because of "neck and back pain." *See* Tr. at 20. While the ALJ did not explicitly address the combined effects of Plaintiff's thoracic kyphosis and asthma, he referenced evidence that Plaintiff had "no significant respiratory abnormalities," which addresses Plaintiff's argument that her kyphosis affected her asthma and ability to breathe. *See* Tr. at 21. The undersigned also notes that, aside from Plaintiff's testimony, the record does not reflect complaints of breathing difficulties other than when Plaintiff had acute respiratory illnesses. *See* Tr. at 39 (Plaintiff testified that curvature in back compressed lungs), 50 (Plaintiff testified that curvature in back affected her abilities to walk long distances and to pick up things from the ground), 448 (follow up from last visit for coughing, cold on January 26, 2011), 449 (coughing, cold on January 13, 2011), 458 ("sick off and on x 2 days" on May 10, 2012). The undersigned's review of the ALJ's decision reveals that the ALJ considered the combined effects of Plaintiff's impairments and the entire record lends inadequate support to the additional limitations alleged by Plaintiff.

2.    Treating Physician

Plaintiff argues that the ALJ ignored the opinion of her treating psychiatrist, Dr. Cornish-McTighe. [ECF No. 12 at 7].

The Commissioner argues that the ALJ reasonably discounted the medical source opinion as being unsubstantiated and inconsistent with other evidence of record. [ECF No. 13 at 13]. The Commissioner maintains the ALJ provided sufficient explanation for discounting part of Ms. Coaxum's opinion. *Id.* at 14. She further argues that Dr. Cornish-McTighe merely signed the opinion completed by Ms. Coaxum without providing any narrative information and that there was no evidence in the record that Dr. Cornish-McTighe ever treated Plaintiff. *Id.* at 15.

Medical opinions are "statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions." SSR 96-5p, *quoting* 20 C.F.R. §§ 404.1527(a)(2), 416.927(a)(2). Medical opinions may only be rendered by "acceptable medical sources," which include licensed physicians, licensed or certified psychologists, licensed optometrists, licensed podiatrists, and qualified speech-language pathologists. SSR 06-3p; *see* 20 C.F.R. §§ 404.1513(a) 416.913(a). "Other sources" are defined as individuals other than acceptable medical sources and include medical providers, such as nurse practitioners, physician assistants, licensed clinical social workers, naturopaths, chiropractors, audiologists, and therapists, as well as non-medical sources, such as educational personnel, social welfare agency personnel, rehabilitation

counselors, spouses, parents, other relatives, friends, neighbors, clergy, and employers. 20 C.F.R. § 404.1513(d).

If a treating source's medical opinion is "well-supported and not inconsistent with the other substantial evidence in the case record, it must be given controlling weight[.]" SSR 96-2p; *see also* 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2) (providing treating source's opinion will be given controlling weight if well-supported by medically-acceptable clinical and laboratory diagnostic techniques and not inconsistent with other substantial evidence in the record). Pursuant to 20 C.F.R. §§ 404.1527(c) and 416.927(c), if a treating source's opinion is not accorded controlling weight, the ALJ should consider "all of the following factors" to determine the weight to be accorded to every medical opinion in the record: examining relationship; treatment relationship, including length of treatment relationship and frequency of examination and nature and extent of treatment relationship; supportability; consistency with the record as a whole; specialization of the medical source; and other factors. *See also Johnson*, 434 F.3d at 654. The ALJ's decision must explain the weight accorded to all opinion evidence. 20 C.F.R. §§ 404.1527(e)(2)(ii), 416.927(e)(2)(ii).

Medical opinions must be considered based on the criteria set forth in 20 C.F.R. § 404.1527(c) and 416.927(c), but opinions from "other sources" are not medical opinions. SSR 06-3p. Although the factors in 20 C.F.R. §§ 404.1527(c) and 416.927(c) do not have to be explicitly considered when evaluating the opinions of other medical sources, they represent basic principles for the consideration of all opinion evidence. *Id.* "The evaluation of an opinion from a medical source who is not an 'acceptable medical source'

depends on the particular facts in each case," and should be based on "consideration of the probative value of the opinions and a weighing of all evidence in that particular case." *Id.*

While the ALJ did not mention Dr. Cornish-McTighe, he addressed the opinion at issue as follows:

> In a July 2012 evaluation form, Jeanette Coaxum, the claimant's casework [at] Charleston/Dorchester Mental Health, opined that the claimant's current and highest GAF in the past year was 50. Although Ms. Coaxum is not an acceptable medical source pursuant to 20 CFR 404.1513(a) and 416.913(a), she is considered another source whose information may help understand how the claimant's impairments affect her ability to work. See 20 CFR 404.1513(d). However, Ms. Coaxum's GAF assessment is inconsistent with the GAFs of 60 assigned by the claimant's treating psychiatrist throughout the record and is not supported by the claimant's essentially normal mental status examinations. Accordingly, Ms. Coaxum's GAFs have been given little weight. (Exhibit 23F).

> In July 2012, Ms. Coaxum also stated that due to the claimant's mood and panic disorders, the claimant has limited but satisfactory ability to perform unskilled work and is seriously limited, but not precluded, from performing semi-skilled and skilled work. Additionally, the counselor stated the claimant has a serious limitation but is not precluded from interacting appropriately with the general public, maintaining socially appropriate behavior, adhering to basic standards of neat and cleanliness, traveling to unfamiliar places and using public transportation. (Exhibits 23F and 26F). Ms. Coaxum's opinions are not consistent with the above residual functional capacity assessment, and although she did not impose specific restrictions, her opinions have been accorded great weight in limiting the claimant to unskilled work without any direct customer service and finding she cannot work in a fast-paced production environment.

> However, little weight has been given to Ms. Coaxum's opinion that the claimant will likely be absent from work for more than 4 days per month due to her psychological impairment and treatment. Ms. Coaxum stated she sees the claimant only once a month for one hour at a time, and the medical records indicate that the claimant has received only monthly psychiatric treatment or counseling since her alleged onset date, lending no support for Ms. Coaxum's opinion. Furthermore, the relatively normal mental status

26

examinations and GAFs of 60 suggest that the claimant's psychiatric symptoms are generally controlled with medication and would not result in absenteeism beyond customary tolerances. Because there is no evidentiary support for this portion of her opinion and because it is inconsistent with the other evidence of record, it has been given little weight. (Exhibit 23F).

Tr. at 23–24.

The undersigned recommends a finding that the ALJ did not err in failing to address the implications of Dr. Cornish-McTighe's signature on the form completed by Ms. Coaxum. In order for a statement to be considered a medical opinion it must be provided by an acceptable medical source and reflect judgments about the nature and severity of the patient's impairments. *See* 20 C.F.R. §§ 404.1527(a)(2), 416.927(a)(2). As a psychiatrist, Dr. Cornish-McTighe was an acceptable medical source. *See* SSR 06-3p, 20 C.F.R. §§ 404.1513(a), 416.913(a). However, the record does not reflect that the statement Dr. Cornish-McTighe signed reflects her judgment about the nature and severity of Plaintiff's impairments. The statement at issue is a copy of the opinion form completed by Ms. Coaxum that bears Dr. Cornish-McTighe's signature underneath the signature, name, and contact information of Ms. Coaxum. *See* Tr. at 465. Aside from Plaintiff's attorney's assertion in the cover letter that Dr. Cornish-McTighe was Plaintiff's treating psychiatrist at the Charleston Community Mental Health facility, nothing in the record reflects a relationship between Plaintiff and Dr. Cornish-McTighe or the reason for her signature. *See* Tr. at 277–78, 461–65. The statement does not contain an indication that Dr. Cornish-McTighe examined Plaintiff, reviewed Ms. Coaxum's opinion, or agreed with Ms. Coaxum's assessment. *See* Tr. at 465. The undersigned therefore rejects Plaintiff's argument that the addition of Dr. Cornish-

McTighe's signature to the "other source" opinion rendered by Ms. Coaxum converts the statement to a medical opinion entitled to special consideration under 20 C.F.R. §§ 404.1527(c) and 416.927(c). Because Dr. Cornish-McTighe's statement does not qualify as a medical opinion, the ALJ was not required to consider Dr. Cornish-McTighe's specialty as a psychiatrist and her treatment relationship with Plaintiff. Therefore, the undersigned recommends a finding that the ALJ adequately considered the opinion at issue and weighed it in light of the evidence in the record.

### 3.    Dr. Beckert's Opinion for DSS

Plaintiff argues that the ALJ failed to give proper consideration to the opinion Dr. Beckert submitted to SCDSS, in which he indicated Plaintiff was disabled. [ECF No. 12 at 8]. Plaintiff further contends that the ALJ's failure to consider the SCDSS form "as evidence of another governmental agency determination but rather treating it as opinion evidence from an examining source was in error." [ECF No. 14 at 3]. Plaintiff further submits that the "decisions of other governmental agency that a claimant is disabled are relevant and material evidence that should be considered and weighed differently than opinions from examining physicians." *Id.* at 2.

The Commissioner argues that Dr. Beckert's opinion was a decision on the ultimate issue of disability that was not entitled to any particular weight or deference. [ECF No. 13 at 16]. The Commissioner further contends that Dr. Beckert did not cite any objective abnormalities and that there was little evidence to suggest Dr. Beckert even examined Plaintiff. *Id.*

The ALJ indicated the following regarding Dr. Beckert's opinion:

Additionally, the undersigned has considered the December 2011 opinion of David Beeker [sic], M.D., of Charleston Community Mental Health Center, that the claimant is unable to work secondary to her major depressive disorder and panic disorder. (Exhibit 24F). However, this opinion is one explicitly reserved for the Commissioner. Moreover, Dr. Beeker's [sic] opinion was rendered on a checklist form supplied by the claimant's attorney, and Dr. Beeker [sic] did not cite any objective abnormalities in support of his opinion. There is also very little documentary evidence showing Dr. Beeker [sic] has personally examined the claimant, rendering his opinion less persuasive. . . . Accordingly, because he failed to cite any objective evidence in support of his opinion and because it is inconsistent with the objective findings of record, Dr. Beeker's [sic] opinion has been given little weight.

Tr. at 24.

The undersigned recommends a finding that the ALJ properly considered Dr. Beckert's opinion. Although Plaintiff correctly points out that Dr. Beckert's opinion was rendered on a SCDSS form as opposed to a form supplied by her attorney, the form on which the opinion was rendered does not convert Dr. Beckert's opinion to a determination from another government agency. DSS Form 1287 specifically states "When individuals claim a disability, *we must determine their functioning level to identify appropriate activities*." Tr. at 456 (emphasis added). The form further states "[p]lease complete this form, after completion, you may give it to the patient or mail it to DSS at the address in Section I." *Id.* The form indicates that SCDSS will make the determination and that the physician is merely completing a statement to aid SCDSS in its determination. The record contains no determination from SCDSS or any other government agency finding Plaintiff disabled, so it was unnecessary for the ALJ to consider such an issue. The ALJ appropriately considered Dr. Beckert's opinion based on the factors set forth in 20 C.F.R. §§ 404.1527(c) and 416.927(c), indicating Dr. Beckert's

specialization by noting that he was a doctor employed by Charleston Community Mental Health Center, but concluding that there was little evidence to show Dr. Beckert examined Plaintiff and that his opinion conflicted with Plaintiff's treatment notes from Dr. Beckert's employer. *See* Tr. at 24. Therefore, the undersigned recommends a finding that the ALJ provided substantial evidence to support his decision to accord little weight to Dr. Beckert's opinion.

### 4.    Ability to Perform Other Jobs

Plaintiff argues that the ALJ relied upon flawed VE testimony to find that Plaintiff could perform other jobs. [ECF No. 12 at 9]. Plaintiff contends that the *DOT*'s description of the job of parking-lot attendant conflicts with the provision of the ALJ's RFC that required no direct customer service and that the VE erroneously testified that his testimony was consistent with the *DOT*. *Id.* at 9–10.

The Commissioner argues that Plaintiff cannot prove an inherent conflict between the DOT and the VE's testimony that Plaintiff could perform the job of parking-lot attendant. [ECF No. 13 at 18]. The Commissioner further maintains that, even if the job as a parking-lot attendant did not comply with the restrictions in the RFC, the ALJ satisfied his burden at step five by finding that Plaintiff could perform two additional occupations with jobs in significant numbers in the economy. [ECF No. 13 at 17–18].

At the fifth step in the sequential evaluation process, the ALJ must consider the claimant's RFC, age, education, and work experience to determine if she can adjust to other work. 20 CFR §§ 404.1520(a)(4)(v), 416.920(a)(4)(v). If the ALJ determines that the claimant can adjust to other work, he will find that she is not disabled. *Id.*

The provisions of 20 C.F.R. §§ 404.1566(d) and 416.966(d) provide that the ALJ should take administrative notice of job information contained in the *DOT*. In some cases, ALJs call upon the services of VEs to address how certain restrictions affect claimants' abilities to perform specific jobs. 20 C.F.R. §§ 404.1566(e), 416.966(e). Because the opinions of VEs sometimes conflict with the information contained in the *DOT*, the SSA promulgated SSR 00-4p to explain how these conflicts should be resolved. "Occupational evidence provided by a VE or VS generally should be consistent with the occupational information supplied by the DOT." SSR 00-4p. Before relying on VE evidence to support a disability decision, the ALJ must obtain a reasonable explanation for any apparent unresolved conflict between occupational evidence provided by the VE and the information in the *DOT*, and explain in the determination or decision how any conflict that has been identified was resolved. *Id.* This task is generally accomplished when the ALJ inquires, on the record, as to whether or not the VE's testimony is consistent with the *DOT* and the VE either discusses the reasons for inconsistencies or testifies that no conflict exists. *Id.*

The DOT describes the job of parking-lot attendant as follows:

Parks automobiles for customers in parking lot or storage garage: Places numbered tag on windshield of automobile to be parked and hands customer similar tag to be used later in locating parked automobile. Records time and drives automobile to parking space, or points out parking space for customer's use. Patrols area to prevent thefts from parked automobiles. Collects parking fee from customer, based on charges for time automobile is parked. Takes numbered tag from customer, locates automobile and surrenders it to customer, or directs customer to parked automobile. May service automobiles with gasoline, oil, and water. When parking automobiles in storage garage, may be designated Storage-Garage Attendant (automotive ser.). May direct customers to parking spaces.

United States. Dept. of Labor. Employment and Training Administration. *Dictionary of Occupational Titles. 4th ed*. United States. Dept. of Labor, 1991. Retrieved December 8, 2014, from http://www.occupationalinfo.org/91/915473010.html.

The ALJ wrote in the decision that "[p]ursuant to Social Security Ruling 00-4p," he had determined that the VE's testimony was "consistent with the information contained in the Dictionary of Occupational Titles." *Id.* He further indicated, "[b]ased on the testimony of the vocational expert, the undersigned concludes that, considering the claimant's age, education, work experience, and residual functional capacity, the claimant is capable of making a successful adjustment to other work that exists in significant numbers in the national economy." *Id.*

The ALJ has an obligation to resolve apparent conflicts between the vocational testimony and the *DOT*, but the undersigned recommends a finding that there was no apparent conflict in this case. *See* SSR 00-4p. Because the SSA declined to define "apparent conflict," it is necessary to look to basic definitions of the words "apparent" and "conflict." "Apparent" means "easy to see or understand." Apparent [Def. 1]. *In Merriam-Webster Online*. Retrieved Dec. 8, 2014, from http://www.merriam-webster.com/dictionary/apparent. "Conflict" means "a mental struggle resulting from incompatible or opposing needs, drives, wishes or internal or external demands." Conflict [Def. 2a]. *In Merriam-Webster Online*. Retrieved Dec. 8, 2014, from http://www.merriam-webster.com/dictionary/conflict?show=0&t= 1417798200. The undersigned's review of the record indicates that there was no reason for the ALJ to

detect an apparent conflict between the VE's testimony and the *DOT* regarding the job of parking-lot attendant because there was no struggle between opposing job demands in the RFC and the identified job of "parking-lot attendant" that was easy to see. Plaintiff's counsel declined the opportunity to object to the qualifications of the VE and did not challenge the VE regarding the consistency of the job of parking-lot attendant with the RFC provided in the ALJ's hypothetical. *See* Tr. at 57, 60. Plaintiff's counsel only raised an issue regarding the consistency of the *DOT* description of the job of parking-lot attendant and the assessed RFC after the ALJ's decision was issued. *See* Tr. at 281. If the conflict was apparent, Plaintiff's counsel should have raised the issue of the conflict to the ALJ either during the hearing or after the hearing, but before a decision was rendered. Furthermore, although Plaintiff argues that the description of "parking-lot attendant" in the *DOT* is enough to show a conflict between the VE's testimony and the *DOT*, the undersigned finds this to be an oversimplified lay interpretation of the vocational evidence. While the *DOT* describes interaction between the worker and customers, a distinction may be drawn between the level of interaction described and the "direct customer service" that the ALJ indicated Plaintiff would be unable to perform. "Direct customer service" implies a one-on-one interaction between a worker and a customer that is not necessarily present between a patron and the individual who parks and retrieves his car at a hotel or restaurant valet service. The ALJ did not specify that Plaintiff was unable to engage in interaction with the public, but instead indicated that she could not engage in "direct customer service." The distinction between the two types of interaction underscores the need for VE testimony. The VE is, by definition, an expert qualified to

determine which jobs may be performed with particular restrictions. The ALJ fulfilled his requirement to resolve conflicts between vocational testimony and the *DOT* when he asked the VE if his testimony was consistent with the *DOT* and the VE responded in the affirmative. *See* Tr. at 59, SSR 00-4p. Therefore, no apparent unresolved conflict exists between the VE's testimony and the *DOT*.

The undersigned recommends a finding that the ALJ's determination that Plaintiff could perform other jobs was supported by the record. In addition to the job of parking-lot attendant, the ALJ identified two other jobs that Plaintiff could perform based on VE testimony. *See* Tr. at 26. He relied on the presence of 270 jobs in South Carolina and 15,900 jobs nationally as a coupon redemption clerk, *DOT* number 290.477-010 and 110 jobs in South Carolina and 19,000 jobs nationally as a lacer. *Id.* Therefore, the Commissioner has satisfied her burden to show that there are jobs Plaintiff can perform. *See Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002). Additionally, the Commissioner has satisfied her burden to show that these jobs exist in significant numbers in the economy. *See Hicks v. Califano*, 600 F.2d 1048, 1051 n. 2 (4th Cir. 1979) (noting that as few as 110 jobs were sufficient to satisfy the Commissioner's burden at step five of the sequential evaluation process). Plaintiff alleges no conflict between the VE's testimony and the *DOT* descriptions of these jobs. Therefore, Plaintiff has not met her burden to prove that she is unable to perform other work. *See Rouse v. Comm'r of Soc. Sec. Admin.*, C/A No. 0:11-2636-MGL-PJG. 2013 WL 6050163, at *8 (D.S.C. Oct. 17, 2013) (holding that substantial evidence supported the ALJ's step five determination where Plaintiff did not provide evidence to challenge a second job identified by the ALJ).

III.    Conclusion and Recommendation

The court's function is not to substitute its own judgment for that of the Commissioner, but to determine whether her decision is supported as a matter of fact and law. Based on the foregoing, the undersigned recommends the Commissioner's decision be affirmed.

IT IS SO RECOMMENDED.

December 8, 2014                          Shiva V. Hodges
Columbia, South Carolina                 United States Magistrate Judge

**The parties are directed to note the important information in the attached
"Notice of Right to File Objections to Report and Recommendation."**

**Notice of Right to File Objections to Report and Recommendation**

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge. Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections. "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'" *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *see* Fed. R. Civ. P. 6(a), (d). Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

Robin L. Blume, Clerk
United States District Court
901 Richland Street
Columbia, South Carolina 29201

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.** 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).